UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ATCHAFALAYA BASINKEEPER,                        CIVIL ACTION
INC., ET AL.

VERSUS

SCOTT A. SPELLMON, ET AL.                  NO. 24-00381-BAJ-EWD

RULING AND ORDER

This case concerns a Clean Water Act permit issued by the U.S. Army Corps of Engineers and its officials ("Defendants" or "Corps") that authorized a wetland project on the Atchafalaya Basin's East Grand Lake (the "Permit"). Plaintiffs, a collection of non-profit organizations, challenge the Corps for violating the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA") in issuing the Permit.

Now before the Court is **Plaintiffs' Motion For Summary Judgment Vacating U.S. Army Corps Of Engineers Permit MVN-2016-01163-CM (Doc. 31)** and **Defendants' Cross Motion For Summary Judgment (Doc. 40)**. Plaintiffs seek relief in the form of a Court Order that:

(1) Declares the Corps' issuance of the Permit illegal and invalid;

(2) Declares that the Corps violated NEPA, the CWA, and their implementing regulations in issuing the East Grand Lake Project Permit;

(3) Vacates the Corps' decision to issue the Permit;

(4) Permanently enjoins the Permit until the Corps complies with NEPA and

the CWA;

(5) Awards Plaintiffs attorney's fees; and

(6) Grants Plaintiffs further and additional relief as the Corps may deem just and proper. (Doc. 31 at 2).

The Court has carefully considered the Administrative Record, the arguments of all parties, and the applicable laws and jurisprudence in this matter. For the following reasons, Plaintiffs' and Defendants' Motions will both be **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

### A. The 1982 Atchafalaya Basin Floodway System Environmental Impact Statement.

The Atchafalaya River Basin is the largest drainage system of the Mississippi River and contributes to the State of Louisiana's economic vitality and the region's environmental health. (AR 450; AR 7017). The Basin provides flood control to the region. (AR 9523–9536). The Basin's water quality, aquatic productivity, and forest health have been in decline, with sedimentation and low oxygen conditions appearing as issues throughout the Basin. (AR 451; AR 7017–7018; AR 450–451; AR 9698).

In 1982, the Corps issued an Environmental Impact Statement ("EIS") for the whole Atchafalaya Basin Floodway System ("ABFS").[1] (AR 9531). The EIS was issued

---

[1] An environmental impact statement (EIS) is a government document that outlines the impact of a proposed project on its surrounding environment. In the United States, these statements are mandated by federal law for certain projects. Environmental impact statements are meant to inform the work and decisions of policymakers and community leaders. *See* Tiffany Middleton, *What is an Environmental Impact Statement?*, AMERICAN BAR ASS'N, What is an Environmental Impact Statement? (last visited March 24, 2026).

2

to develop a plan to use the Basin to provide greater flood protection to Louisiana and to restore the Basin's natural environment. (AR 9713; AR 9536). The EIS discussed various potential restoration options that could be undertaken to address flood control and environmental protection, such as widening water channels and sedimentation control. (AR 9650–9657).

The Corps established thirteen water management unit ("WMU") systems in the ABFS for which water management plans could be formulated. (AR 9540–9542). Five of these WMUs were identified as having the best potential for ecological restoration: Buffalo Cove, Henderson Lake, Beau Bayou, Flat Lake, and Cocodrie Swamp. (AR 9541). The 1982 EIS initially approved pilot projects in Buffalo Cove and Henderson Lake Restoration, and since then, activities have also taken place at Beau Bayou. (AR 9803; AR 13391; AR 2774).

The project at issue in this case is the East Grand Lake Project.

### B. The East Grand Lake Project

The East Grand Lake Project ("EGL Project") area encompasses the Flat Lake WMU and parts of the Upper Belle River WMU. (AR 3190; AR 7482). The EGL Project is designed to enhance water flows and thereby improve water quality, address sedimentation issues, and improve wildlife and forest habitat. (AR 7017; AR 4864, AR 7482; AR 131; AR 7455).

The State of Louisiana applied to the Corps for a permit to construct and operate the EGL Project. (AR 127). The Corps publicly noticed the Louisiana Coastal Protection and Restoration Authority's ("CPRA") EGL Project for comment on March 19, 2018, and Plaintiffs commented in opposition to the Project. (AR 7026; AR 573–

693). Plaintiffs relied, in part, on an expert report prepared by Dr. Ivor van Heerden, which predicted that the EGL Project would cause excessive sedimentation, destroy East Grand Lake wetlands, and cause hypoxia. (AR 694–725). The CPRA withdrew its application for the 2018 version of the EGL Project in 2021 because the proposal did not sufficiently mitigate impacts to wetlands. (AR 3989–3999).

In 2022, the CPRA resubmitted an application for a revised version of the EGL Project. (AR 4861; AR 4866; AR 4771). The 2022 application proposed 12 restoration elements, including dredging existing spoil banks, spreading the dredged spoil through the water canal, and replacing nonnative trees with native ones. (AR 5037; AR 4862; AR 5084; AR 7014–7015).

The Corps again publicly noticed the 2022 version of the EGL Project, and Plaintiffs again commented in opposition to the 2022 proposal of the EGL Project. (AR 5037). Plaintiffs' comments relied, in part, on four new reports from Dr. van Heerden, which, among other things, responded to CPRA's comments on the 2018 version of the Project. (AR 1583–1639; AR 2328–2415; AR 3267–3316; AR 6109–6132; AR 5247–5301). The Corps ultimately issued a permit authorizing the EGL Project in late 2023, accompanied by a 44-page report that encompasses a NEPA Environmental Assessment, CWA Section 404(b)(1) evaluation, and the Corps' public interest review. (AR 7448–7545). The Corps ultimately issued a permit authorizing the EGL Project in late 2023, accompanied by a 44-page report that encompasses a NEPA Environmental Assessment, CWA Section 404(b)(1) evaluation, and the Corps' public interest review.

## II.   LEGAL STANDARD

### A. The National Environmental Policy Act

The National Environmental Policy Act of 1969 ("NEPA") mandates that federal agencies evaluate the environmental impacts of proposed agency action before taking action. 42 U.S.C. §§ 4321–4370d. NEPA is a procedural statute intended "to ensure that federal agencies 'carefully consider detailed information concerning significant environmental impacts,' and at the same time 'guarantee[] that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision.'" *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1993) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 379 (1989).

NEPA requires agencies to prepare an Environmental Impact Statement for all "major Federal actions significantly [affecting] the quality of the human environment." 42 U.S.C. § 4332(2)(C). The threshold determination of whether the effect of the proposed action is sufficiently "significant" to necessitate the production of an EIS is made by the preparation of an Environmental Assessment ("EA"). *Sabine River*, 951 F.2d at 677. The EA is a more "concise" environmental review that "briefly" discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a "Finding of No Significant Impact" ("FONSI"), in which case an EIS is not necessary. *Id.*

An EA must provide sufficient evidence and analysis to support either a finding of significant impact or no significant impact. The EA must also discuss the purpose and need for the proposed action, alternatives, and the environmental impacts of the

5

proposed action and alternatives. 40 C.F.R. § 1501.5.[2]

An EIS must include a detailed statement on: (i) the reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; and (iii) a reasonable range of alternatives to the proposed agency action. 42 U.S.C. § 4332(C)(i)–(iii).

Ultimately, NEPA is a statute that governs procedure, rather than the substantive outcome; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences. *Sabine River*, 951 F.2d at 676 (quoting *Robertson*, 490 U.S. at 350).

## B. The Clean Water Act

The CWA prohibits the discharge of dredged or fill material into navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a). In issuing these dredge and fill permits, the Corps must conduct a public interest review which balances reasonably expected benefits against reasonably foreseeable detriments. The Corps must also follow guidelines issued by the Environmental Protection Agency and the Corps under CWA Section 404(b)(1). 33 C.F.R. § 320.4(a)(1).

Under the Section 404(b)(1) Guidelines, first, the Corps may not issue permits for activities that "will cause or contribute to significant degradation of the waters of

---

[2] The regulations cited are those issued in 2020. The federal government rescinded these regulations on February 25, 2025, but they apply here, as Defendants issued the relevant decision before the rescission of the regulations. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025); *see also Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 n.3 (9th Cir. 2022) (explaining that the version effective at the time the decision was issued governs the analysis).

the United States." 40 C.F.R. § 230.10(c). Second, the Corps may not grant a permit where there is a "practicable alternative" that would have a "less adverse impact on the aquatic ecosystem," as long as the alternative does not have other significant adverse environmental consequences. 40 C.F.R. § 230.10(a). Third, the Corps may not issue a permit unless appropriate and practicable steps have been taken which will minimize the potential adverse impacts of the discharge on the aquatic ecosystem. 40 C.F.R. § 230.10(d). Fourth, the Corps can require compensatory mitigation in order to offset environmental losses resulting from unavoidable impacts to waters of the United States. 40 C.F.R. § 230.93(a)(1). The Corps must deny a Section 404 permit if the project does not comply with the above Section 404(b)(1) Guidelines. 33 C.F.R. §§ 320.4(a)(1), 323.6(a).

## III.    STANDARD OF REVIEW

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of a challenge to an agency action under the Administrative Procedure Act (APA), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Thus, in evaluating a case on summary judgment, the court applies the standard of review from the APA. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001).

In a challenge to agency action brought pursuant to the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be,"

7

among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)–(D). When reviewing for arbitrariness and capriciousness, a court considers whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Instead, this court looks to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Alleged violations of both NEPA and the CWA are reviewed under the APA.

## IV.    ANALYSIS

Both parties move for summary judgment, centering around five main issues. First, Plaintiffs argue that the Corps lacked sufficient support for its finding that the EGL Project would neither have a significant impact on the environment nor violate the CWA 404(b)(1) Guidelines, because the Corps: (i) relied on the project applicant's analysis, rather than conducting an independent analysis; and (ii) ignored significant public comments. The Corps responds that it provided adequate support for its

finding that the EGL Project would neither have a significant impact on the environment nor violate the CWA 404(b)(1) Guidelines, and that it considered all significant public comments.

Second, Plaintiffs contend that the Corps failed to sufficiently evaluate alternative sites, as NEPA and the CWA require. The Corps responds that it adequately considered alternatives.

Third, Plaintiffs urge that the Corps was required to issue a Supplemental Environmental Impact Statement ("SEIS") for the Basin-wide 1982 ABFS EIS before permitting the EGL Project, because significant new circumstances have arisen since 1982. The Corps responds that it was not required to supplement the 1982 ABFS EIS.

Fourth, Plaintiffs argue that the Corps improperly reached a FONSI, rather than a finding of significant impact. The Corps responds that the EGL Project did not warrant an EIS.

Finally, Plaintiffs assert that the Corps improperly determined that CWA compensatory mitigation was not required. The Corps responds that the permit conditions met CWA requirements to minimize adverse impacts, and compensatory mitigation was not required.

The Court will address each issue in turn.

**A. The Corps' Decision Document on the East Grand Lake Project.**

Before assessing whether the Corps' decision document ultimately comports with NEPA and the CWA, it would be helpful to provide a description of the document. As previously stated, the Corps ultimately issued a permit authorizing the

9

EGL Project in late 2023, accompanied by a 44-page decision document that encompasses a NEPA Environmental Assessment, CWA Section 404(b)(1) evaluation, and the Corps' public interest review. (AR 7448–7545). The relevant portions of the decision document are as follows.

The Corps discusses proposed avoidance and minimization measures[3] and proposed compensatory mitigation[4] in two paragraphs. (AR 7015). The decision document then describes the purpose and need for the Project. (AR 7017–7019).

Sixteen pages are next dedicated to the public notice results. (AR 7019–7035). First comes comments submitted by state and federal resource agencies, along with CPRA's responses to the agency comments. (AR 7020–7023). Next comes a summary describing the comments in favor of and in opposition to the project. (AR 7023–7025). The decision document then explains that the applicant provided two documents in response to the public comments.[5] (AR 7026). The next nine pages consist of CPRA's

---

[3] The proposed avoidance and minimization measures paragraph explains that "[a]s described by the applicant, avoidance and minimization efforts included a goal to design the project for avoidance of jurisdictional wetlands and NWW, as well as wildlife habitat impacts, to the extent possible. . . . The project was designed to improve hydrologic conditions for a large area and create wetlands so that impacts to wetlands associated with this project would be offset by benefits to the project. Approximately 171 elements were considered for the project. A letter dated June 24, 2018, submitted by the applicant contains explanation related to minimizing impacts to jurisdictional areas by reducing from 171 elements to 12 elements to be constructed providing the most benefit." (AR 7015).

[4] The proposed compensatory mitigation paragraph states: "The applicant's project purpose is to restore natural hydrology to improve water quality in backwater reaches to promote the health of forested wetlands and benefit fish and wildlife habitat. The project design impacts wetlands, creates wetlands, and enhances wetlands within the project area. While direct wetland losses will occur from project construction, the incorporation of wetland creation and enhancement features into the project design is anticipated to outweigh these impacts thus averting the requirement for compensatory mitigation." (AR 7015).

[5] The Corps explains that CPRA's response to the comments was written in part in response

response to the public comments. (AR 7026–7034). Next comes three paragraphs of the Corps' response to the public comments. (AR 7034–7035).

Afterwards comes an alternatives analysis (AR 7035–7039) required by NEPA and the CWA. In one paragraph, the Corps rejects a no-action alternative option.[6] (AR 7036). Then, the Corps discusses off-site alternatives. The Corps provides one paragraph stating that off-site alternatives are not practicable.[7] This is followed by two pages of information submitted by CPRA in 2019 discussing the process by which it selected the 12 elements for implementation and why other elements were not selected.[8] (AR 7037–7038). The Corps then provides a one paragraph on-site

———————————————

to comments submitted for the 2018 proposal and in part in response to comments submitted for the 2022 proposal: "The applicant provided two separate documents in response. A more expansive version of this project was previously reviewed between 2018 and 2020. That application was withdrawn in 2021. The public notice for the first review was advertised March 19, 2018, and received many of the same comments as the public notice associated with the current review. The Corps contacted the applicant by email dated May 22, 2023, to confirm that the response to comments provided for the 2018 public notice was still valid for the current comments. The applicant responded by email dated May 24, 2023, stating that it is still valid. The applicant further provided a spreadsheet with responses to the current public notice and reiterated responses to comments from the 2018 public notice." (AR 7026).

[6] The no-action alternative paragraph states: "The no action alternative would prevent the applicant from restoring hydrology and creating and enhancing swamp and bottomland hardwoods wetlands. Unmaerialized anticipated improvements would not lead to a healthier wetland system providing commercial and recreational users of this area of the Atchafalaya Basin with increased opportunity for those activities. Additionally, no action would prevent job creation in the field of biology and construction." (AR 7036).

[7] The off-site alternatives paragraph states: "This project is site-specific in that the applicant is targeting a specific area of the Atchafalaya Basin they determined to be [in] need of hydrologic restoration based on its study and that which can reasonably be achieved. Additionally, the Atchafalaya Basin is largely jurisdictional with a mix of wetlands and [non-wetland waters]. The opportunity to avoid wetlands for this project would be limited to the use of [non-wetland waters] which would be inconsistent with the goals of the project. Because of the site-specific nature of this activity, off-site alternatives were deemed not practicable." (AWR 7037).

[8] This information explains that the EGL Project had included hundreds of potential project

11

alternative analysis for the single on-site alternative (the option ultimately selected).[9] (AR 7038). After, the Corps states that the selected option (the on-site alternative) is the least environmentally damaging practicable alternative under the Section 404(b)(1) Guidelines. (AR 7039).

Next comes an evaluation for compliance with the CWA Section 404(b)(1) Guidelines. (AR 7039–7045). This section consists of four tables assessing the degree to which certain environmental characteristics could be potentially impacted by the project, followed by a paragraph for each table explaining why the Corps selected the various degrees of impact.[10] (AR 7040–7042). The Corps then discusses various actions it has taken to minimize adverse impacts. (AR 7043). The Corps then explains its factual determinations of potential impacts, taking into account the actions to minimize effects, in one paragraph. (AR 7044).

The Corps moves on to its public interest review. (AR 7045–7049). This is followed by a brief section on avoidance and minimization,[11] and compensatory

_____

elements, 171 of these were further studied, and 12 were selected for implementation. (AR 7038).

[9] The on-site alternative paragraph states: "(On-site alternative 1 (applicant's preferred alternative): The applicant designed the project to avoid onsite wetlands as much as possible. This design was selected because it minimizes wetland impacts to the maximum extent practicable while incorporating elements strategically located to maximize ecological benefit from improved from and circulation. This alternative is a reduction of scope from the original design." (AR 7038).

[10] In the table, the Corps essentially has to select whether the project will have no effect, a negligible effect, a minor short-term effect, a minor-long term effect, or a major effect on various environmental characteristics.

[11] The avoidance and minimization explains that avoidance and mitigation measures were described at the beginning of the report, and also states: "New wetlands will be created, and existing wetlands will be enhanced as part of the project, neutralizing wetlands impacts

mitigation.[12] (AR 7049). The remainder of the decision document discusses compliance with other laws not relevant here and special conditions of the permit. (AR 7049–7057).

In the decision document, the Corps found that:

(1) the issuance of the permit authorizing the EGL Project would not have a significant impact on the quality of the human environment, and thus an EIS was not necessary (AR 7056);

(2) there were no practicable alternatives and the applicant's preferred alternative was the least environmentally damaging option (AR 7039); and

(3) compensatory mitigation was not required (AR 7049).[13]

As a condition of the Permit, the Corps required CPRA to adhere to a self-submitted Adaptive Management Plan ("AMP").[14] (AR 7055; AR 7373–7430).

---

associated with this project." (AR 7049).

[12] The compensatory mitigation paragraph states that compensatory mitigation is not required because: "The proposed project would convert approximately 4.4 acres of jurisdictional forested wetlands to jurisdictional Non-Wetland Waters (NWW), create 2.25 acres of fresh marsh, and enhance 3.6 acres of jurisdictional bottomland hardwood wetlands. The wetland impacts associated with this project are offset by the creation and enhancement activities included in the project plan." (AR 7049).

[13] Compensatory mitigation means the restoration, establishment, enhancement, and/or preservation of wetlands, streams, and other aquatic resources. The purpose of compensatory mitigation is to offset unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved. *See Background about Compensatory Mitigation Requirements under CWA Section 404*, ENV'T PROT. AGENCY, https://www.epa.gov/cwa-404/background-about-compensatory-mitigation-requirements-under-cwa-section-404 (last visited March 24, 2026).

[14] CPRA refers to the adaptive management as follows: "Adaptive management, as CPRA defines it, is a structured process for making decisions over time through active learning that enables adjustments to be made in projects and programs as new information becomes available (Raynie, 2017). Adaptive management embraces a scientific approach that involves

After the issuance of the Permit, Plaintiffs filed this lawsuit, alleging that the Corps violated the CWA and NEPA in issuing the Permit because: (1) the Corps unreasonably found that the EGL Project will not have significant impacts; (2) the Corps failed to sufficiently evaluate alternatives; (3) the Corps failed to supplement its 1982 Basin-wide ABFS EIS before permitting the Project; (4) the Corps' Finding of No Significant Environment Impact ("FONSI") was unlawful; and (5) the Corps improperly determined that the EGL Project did not require compensatory mitigation.

## A. Plaintiffs Have Standing.

The Court must first ensure that Plaintiffs have Article III standing to challenge the Permit. To establish standing in federal proceedings, a party must demonstrate the "triad of injury in fact, causation, and redressability." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998). The injury in fact must be "a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent.'" *Id.* Plaintiffs are conservation and advocacy groups, for whom Plaintiffs seek organizational standing. Such standing exists when an entity's "members would otherwise have standing to sue in their own right, the interests at stake are germane to the [entity's] purpose,

---

identifying goals and objectives, developing and implementing actions, assessing the system's response to the actions, and utilizing that knowledge to make management decisions. It also recognizes the importance of stakeholder engagement and consensus building when implementing actions that affect structural, ecological, and socio-economic systems. An adaptive management approach helps identify realistic outcomes that can be expected from project implementation. This plan will assist in guiding the design, construction, implementation and reporting of the East Grand Lake (EGL) project throughout its project life. As is consistent with the principles of adaptive management, this plan will be a living document that can be modified during project implementation as conditions warrant." (AR 7480).

14

and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The Court finds that Plaintiffs have satisfactorily established standing. (Doc. 31-11 at 48–53). Moreover, Defendants do not contest that Plaintiffs have standing. (Doc. 37-1 at 3).

### B. The Corps' Decision Document Did Not Provide Adequate Support for its Finding that the EGL Project Would Neither Violate the CWA Nor Have a Significant Impact on the Environment.

Plaintiffs argue that the Corps' decision did not contain adequate support for its finding that the EGL would neither violate the CWA Guidelines nor have a significant impact on the environment. According to Plaintiffs, the Corps' decision lacked support in three key ways: (1) the Corps failed to provide independent analysis, instead relying on analysis conducted by the project applicant; (2) the Corps failed to respond to significant public comments; and (3) the Corps unreasonably relied on an Adaptive Management Plan ("AMP") in the effects analysis. Ultimately, Plaintiffs claim that the Corps "articulated very little basis for its findings of no significance." (Doc. 31-11 at 23). The Court will consider each of Plaintiffs' arguments in turn.

### i. CWA and NEPA Statutory Requirements.

Under the CWA and NEPA, the Corps is required to evaluate the environmental impacts of an activity before issuing a permit. Specifically, under the CWA, a permitting decision requires a determination of cumulative effects on the aquatic system and the Corps cannot issue a dredge or fill permit if the activity "will

cause or contribute to significant degradation of waters of the United States." 40 C.F.R. §§ 230.11(g), § 230.10(c). Under NEPA, an agency must examine "the reasonably foreseeable environmental effects of the proposed agency action," as well as "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(i)–(ii). The agency must ultimately determine whether the project's environmental impacts are significant. 42 U.S.C. § 4336(b)(1)–(2).

### ii. The Corps Did Not Provide Sufficiently Independent Analysis in its Decision Document.

NEPA allows an agency to request that a project applicant submit environmental information or prepare an environmental document. 40 C.F.R. § 1506.5(b). However, the agency is required to independently evaluate the environmental information or environmental document submitted by the applicant. 40 C.F.R. § 1506.5(b)(5).

Plaintiffs argue that Defendants did not independently analyze the EGL Project's environmental effects; instead, the Corps "delegated the analysis of these impacts to the applicant." (Doc. 31-11 at 27). Plaintiffs argue that public comments and scientific reports produced evidence of significant environmental impacts, and that the project applicant (CPRA) responded to some of these comments; the Corps merely copied and pasted CPRA's responses into its decision, without indicating that it independently analyzed CPRA's research or the comments that CPRA responded to.[15] Plaintiffs take issue with the fact that "[n]owhere does the Corps say that it

_____

[15] The Corps' public comments section candidly states that CPRA provided some of the public

weighed the applicant's studies, reviewed the data provided, and found it to be credible. Nor does the Corps anywhere say that it weighed the commenters' studies and found them not to be credible." (Doc. 31-11 at 28).

Defendants first respond that, generally, the Corps did offer a reasoned justification for concluding that the project's impacts to the environment were minor and overall beneficial, because: (1) the Corps evaluated environmental impacts such as water quality, nutrient circulation, and uptake; (2) the Corps considered public comments about excess sedimentation; and (3) the Corps' analysis was sufficient and commensurate with the complexity and nature of the EGL Project. As to independent analysis, Defendants respond that "[t]he Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA," *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-23-SDDEWD, 2020 WL 1450750, at *11 (M.D. La. Mar. 25, 2020) (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986)).

After review, the Court agrees with Plaintiffs. The vast majority of the Corps' public comment analysis is the project applicant's analysis. (AR 7025–7035). In fact, nine pages of the analysis are just CPRA's response to public comments which the Corps copied and pasted. The Corps only provides its own analysis in three

---

comments analysis. The Corps states that "[t]he public notice for the first review was advertised March 19, 2018, and received many of the same comments as the public notice associated with the current review. The Corps contacted the applicant by email dated May 22, 2023, to confirm that the response to comments provided for the 2018 public notice was still valid for the current comments. The applicant responded by email dated May 24, 2023, stating that it is still valid. The applicant further provided a spreadsheet with responses to the current public notice and reiterated responses to comments from the 2018 public notice." (AR 7026).

17

paragraphs that do not point to specific studies or comments that the Corps considered, even though the Corps received hundreds of pages of comments from the public. (Doc. 40-1 at 11). While Defendants are correct that the Corps was not required to gather its own environmental information, the Corps was required to "independently evaluate the information submitted" by the applicant, 40 C.F.R. § 1506.5(a), and to reflect its independent evaluation in the record. *O'Reilly v. All State Fin. Co.*, No. 22-330608, 2023 WL 6635070 at \*5 (5th Cir. Oct. 12, 2023) (vacating the Corps' issuance of a FONSI because, in part, "[n]othing in the record suggests that the Corps either performed the required independent evaluation of the applicant-submitted hydrologic study or conducted its own research."). In other words, the Corps is not permitted to "reflexively rubber stamp a statement prepared by others," but the Corps' three paragraph summary fails to rebut that it did just that. *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 642 (5th Cir. 1983). Perhaps the Corps did conduct its own independent analysis, but in its three paragraph summary, "[t]he EA as written prevents us from discerning whether the Corps assessed and approved of [CPRA's] responses to the comments or simply 'rubber stamp[ed]' them." *O'Reilly*, 2023 WL 6635070 at \*5 (citing *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 642 (5th Cir. 1983)).

It is axiomatic that the Corps was required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made[,]'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, but the Corps' three paragraph summary does not indicate why it believed that

18

CPRA's analysis was more persuasive than the numerous studies and comments submitted in opposition to the project on issues such as hypoxia or eutrophication. *See O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at \*5 (5th Cir. Oct. 12, 2023) (vacating the Corps' issuance of a FONSI because, in part, the Corps was essentially silent as to why it agreed with the applicant's studies over other submitted studies). Nor does the Corps point to any other place in the record indicating that it weighed these studies. The Court is not suggesting that the Corps blindly trusted CPRA's analysis, but the law requires the Corps to adequately reflect its own reasoning in the record, which it has failed to do here.

### iii. The Corps Failed to Respond to Significant Public Comments.

Under the APA's notice and comment procedure, "[a]n agency must consider and respond to significant comments received" during the comment period. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). The "[f]ailure to address [significant] comments, or . . . [an] attempt to address them in a conclusory manner" is grounds for reversal of an agency decision. *Ass'n of Priv. Colls & Univs. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012).

Plaintiffs assert that Dr. van Heerden's comments, as well as their own comments about the Buffalo Cove and Beau Bayou Projects, were significant, but that the Corps failed to consider them in its decision.

### a. Dr. van Heerden's Comments.

With respect to Dr. van Heerden's comments, Dr. van Heerden originally submitted his scientific report in 2018 as a comment to the 2018 version of the

19

EGL Project. (AR 694–725). In 2018, CPRA responded to Dr. Van Heerden's 2018 report. (AR 3223–3323).

Then, in 2022, Dr. van Heerden submitted four additional, new reports for the 2022 version of the EGL Project, addressing sedimentation, eutrophication, and hypoxia. (AR 1583–1639; AR 2328–2415; AR 3267–3316; AR 6109–6132; AR 5247–5301). One of Dr. van Heerden's reports responded directly to the reply CPRA provided to his 2018 report. (AR 3267–3316).

In its decision, the Corps copied and pasted CPRA's 2018 response to the first report that Dr. van Heerden submitted in 2018 for the 2018 version of the project. (AR 7027–7032). CPRA did not respond to the four new reports that Dr. van Heerden submitted, referring only to "the report from Dr. van Heerdan (sic)" and "the van Heerdan (sic) report" (i.e., the 2018 report). (AR 7031). The Corps did not indicate in its three-paragraph public comments summary that it independently considered any of Dr. van Heerden's reports, much less responded to them. Rather, the Corps merely copied and pasted CPRA's outdated response to Dr. van Heerden's 2018 report.

Defendants argue that an agency does not need to explain why it decided to credit some studies over others, citing *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1073 (9th Cir. 2014) ("Therefore, we hold that, despite the fact that the BLM did not recite its reasons for relying on the studies cited in the EA as opposed to the studies cited by the comment, the BLM still performed the 'hard look' required by NEPA."). Defendants also argue that the APA requires "substantial deference" to an agency "when reviewing drafting

decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008).

Perhaps the Corps did indeed independently evaluate the public comments before it, including Dr. van Heerden's reports, but its EA fails to provide an adequate independent analysis. While the Corps has discretion over how lengthy of a response to public comments it provides, the Corps is still required to "engage with the considerable contrary scientific and expert opinion." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020). Based on the EA, it does not appear that the Corps engaged with contrary scientific and expert opinion, instead delegating the task to the project applicant without providing any independent response to Dr. van Heerden's reports. NEPA dictates that "the agency shall independently evaluate the information submitted or the environmental document," 40 C.F.R. § 1506.5(b)(2), but the EA does not indicate that the Corps did so. Moreover, even CPRA's response to comments was insufficient because it did not meaningfully engage with Dr. van Heerden's reports. Accordingly, the Court finds that the Corps has failed to "examine the relevant data and articulate a satisfactory explanation for its action," in violation of the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### b. Buffalo Cove and Beau Bayou Comments.

Plaintiffs also contend that the Buffalo Cove and Beau Bayou Projects presented significant parallels to the EGL Project, specifically with respect to

21

sedimentation issues, that the Corps should have considered in its analysis. Some background information on the Buffalo Cove and Beau Bayou Projects would be informative.

As previously mentioned, the Buffalo Cove, Beau Bayou, and Flat Lake (which the EGL Project encompasses) WMUs were formed in the 1982 ABFS EIS. The Buffalo Cove and Beau Bayou Projects were both required to measure, report on, and limit sediment accretion. (AR 12808; AR 2497). The Buffalo Cove Project was implemented by the Corps and a state program now housed under CPRA. (AR 12767). Plaintiff Atchafalaya Basinkeeper commented in opposition to Beau Bayou because it was concerned about siltation. (AR 66–67). Both Projects ultimately experienced excess sedimentation issues. Devices used to measure Beau Bayou's sediment were possibly buried under at least twelve inches of sediment. (AR 13685–13686). Similarly, some of Buffalo Cove Project's 62 sampling sites were inoperable and abandoned due to sediment accretion. (Doc. 56 at 15–19).

Sedimentation is a serious problem in the Basin. According to the Corps' 1982 ABFS EIS, the "sedimentation is destroying wetlands and open water bodies within the floodway, and this not only reduces aquatic productivity, but lowers esthetic values and compounds the loss of cultural resource sites." (AR 9685).

Plaintiffs submitted comments to the 2022 EGL proposal predicting that the excess sedimentation that took place at the Buffalo Cove and Beau Bayou Projects would also take place at the EGL Project. (AR 5261; AR 5276–5277; AR 5292–5293;

22

AR 3495; AR 3665). Plaintiffs claim that the Corps ignored these significant comments.

The Corps responds that its decision indicates that it did consider Buffalo Cove and Beau Bayou's excess sedimentation, explaining in its decision document that "[the EGL] project is different than those projects in many ways" because the bottom elevation of the proposed restoration elements is different from Beau Bayou's. (AR 7026). Plaintiff replies that it was CPRA, not the Corps, that discussed Buffalo Cove and Beau Bayou, because that discussion was found in CPRA's response to public comments, which the Corps merely copied and pasted into the decision document. Plaintiffs argue that the Corps failed to take a "hard look" at the environmental consequences evident from the two projects. *Balt. Gas and Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).

The Court agrees with Plaintiffs. The Corps has already recognized excess sedimentation as a serious threat to the Atchafalaya Basin Floodway System, and this is a theme repeated throughout the AR. While Plaintiffs and Defendants dispute how much of the excess sedimentation is natural rather than the result of the two projects, severe excess sedimentation experienced at two WMU projects clearly has bearing on a third WMU project site. Plaintiffs cited Buffalo Cove and Beau Bayou over twenty times in the EGL Project comments it submitted in 2022, (AR 5256, 5261, 5265, 5276–5277, 5281–5283), but it is CPRA, not the Corps, who briefly assesses the transferability of the Buffalo Cove and Beau Bayou's sedimentation issues to the EGL Project.

The Corps did not mention the projects in its own three-paragraph public comments summary, and it did not indicate that it independently analyzed the CPRA's six-sentence response to these projects. (AR 7026–7027). Even if the Corps ultimately determined that excess sedimentation at the Buffalo Cove and Beau Bayou Projects would not occur at the EGL Project, comments about these projects are relevant, and the Corps failed to independently analyze the results of these two relevant projects.

### iv. The Corps Did Not Improperly Rely on the AMP in its Determination that the Adverse Effects Were Minimized.

The AMP establishes project goals and objectives (AR 748990), a process for periodic evaluation to determine if those goals are being met (AR 7503–7505); and actions that the permittee can take if the project is not meeting those goals (AR 7505–7006). The Corps made the adoption of the AMP a special condition for granting the permit. (AR 7055).

The Corps mentions the AMP a few times in its decision:

(i)   In the Corps' 404(b) factual determinations section: "[T]he applicant has provided a monitoring plan that will identify if excessive siltation occurs, and an adaptive management plan that details what actions would be taken to address excess siltation. Based on this information the project is expected to be overall beneficial." (AR 7044);

(ii)  In the Corps' public interest factors review:

a. "Concerns regarding potential sedimentation are acknowledged; however, provisions for monitoring and adaptive management would

24

be made enforceable conditions of any permit granted for the project." (AR 7046);

    b.  "By opening cuts and re-establishing old tributaries erosion and accretion could occur. The applicant has plans to address these potential issues in the monitoring and adaptive management plans should such processes occur." (AR 7046); and

(iii)    In the Corps' 404(b) consideration of cumulative impacts: "While overall benefit is anticipated, the proposed project includes provisions for monitoring and adaptive management plans to observe the environmental response to these treatment measures and establish contingencies to address deleterious results. Therefore, the proposed project is not expected to contribute to the cumulative degradation of wetland resources in the Atchafalaya Basin." (AR 7049).

The project applicant also addressed the AMP at several points in response to public comments. (AR 7022; AR 7032; AR 7035).

Plaintiffs contend that the AMP is ineffective to remediate harm, and therefore the Corps improperly relied on the AMP to determine that the Corps minimized adverse environmental effects, as required by the CWA 404(b) Guidelines. Plaintiffs assert that the AMP is ineffective because it does not require CPRA to take any mandatory action to remediate excess sedimentation (AR 7490; AR 7504), and is thus so noncommittal and vague as to be unenforceable. Plaintiffs argue that the Beau Bayou Project also had a mandatory sedimentation monitoring system as a special

25

condition to its permit (AR 2493; AR 2494), but the Beau Bayou Project's monitoring system became unusable because it was buried by sediment. (AR 13685–13686).

The Corps responds that the Permit properly identified and minimized adverse impacts to wetlands. Specifically, the Corps points out that the 2022 EGL Project proposal scaled back the 2018 proposal, and that the 2022 proposal includes features that create and enhance wetlands by limiting the spread of dredged spoil and planting trees in wetlands. (AR 7014; AR 7043; AR 7040). Defendants refer to the AMP as a simple "added layer of assurance." (Doc. 40-1 at 32). In addition, Defendants contend that the AMP satisfies other minimization measures contemplated by the 404(b) Guidelines. 40 C.F.R. §§ 230.94(c)(10), 230.94(c)(9), 230.94(c)(11). Moreover, the Corps argues that Plaintiffs failed to cite any case supporting their contention that an AMP must impose mandatory requirements.

Plaintiffs respond that the AMP can, as a general matter, be used to minimize adverse impacts, but that this AMP is inadequate to do so because: (1) it allows for three years of sedimentation to accrue before CPRA is required to take any action to address the problem; and (2) it allows CPRA to act through "[o]ther methods" to limit sediment accretion, which Plaintiffs assert gives CPRA unchecked discretion. (AR 7530).

The Court first finds that the AMP was not simply an "added layer of assurance," but rather than integral part to the Corps' mitigation measures, as evident from the three specific references to the AMP above. However, the Court finds that the Corps' general reliance on the AMP to establish that adverse effects were

minimized, as required by CWA, was not arbitrary or capricious. As Defendants point out, while the "[o]ther methods" option is open-ended, the Court does not believe that that provision, nor the three year clock, inherently makes the AMP inadequate for addressing excess sedimentation in this case. Specifically, the AMP attempts to prevent sedimentation, halt sedimentation and to allow natural processes to undo excess sedimentation. (AR 7035; AR 7505–7506; AR 7530). In making this finding, the Court is not summarily determining that the Corps' CWA adverse effects analysis is sufficient, but rather that the use of the AMP does not inherently invalidate the analysis. Further discussion of the adverse impacts analysis is found in the compensatory mitigation section below.

### C. The Corps' Alternatives Analysis Fall Below the Standards Set by CWA and NEPA.

Plaintiffs next argue that the Corps' alternatives analyses violated the CWA and NEPA because the Corps' alternatives analyses: (1) did not describe alternatives or the environmental effects of those alternatives; (2) provided only a three-sentence statement choosing the applicant's preferred alternative; and (3) relied on the applicant's alternatives analysis but did not include its own independent evaluation. The Corps responds that its analysis was sufficient under both the CWA and NEPA.

### i. NEPA and CWA Alternatives Analysis Requirements.

NEPA requires that the EA discuss alternatives and "the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1501.5(c)(2) (2020); 33 C.F.R. § 230.10(b). Agencies can consider no-action alternatives, off-site alternatives, and on-site alternatives. The Corps must take "a hard look at the

alternatives and explain its reasons for rejecting them." *Sierra Club v. Watkins,* 808 F. Supp. 852, 871 (D.D.C. 1991).

The CWA requires an agency to deny a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). The CWA imposes two additional presumptions for projects that are not 'water dependent,' as is the case here. (AR 7019); 40 C.F.R. § 230.10(a)(3). First, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). Second, "all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *Id.* The project applicant "bears the burden of providing detailed, clear, and convincing information proving that an alternative[s] with less adverse impact [are] impracticable." *Sierra Club v. Van Antwerp,* 362 F. App'x. 100, 106 (11th Cir. 2010).

### ii. The Corps Did Not Independently Evaluate Alternatives or Discuss the Environmental Effects of Alternatives.

Under the CWA and NEPA, where an applicant submits an alternatives analysis, the Corps must "independently evaluate" the applicant's identified alternatives, and "document in the record the . . . independent evaluation of the information [submitted by the applicant for the EIS] and its accuracy." *Sierra Club v. Van Antwerp,* 709 F. Supp. 2d 1254, 1263 (S.D. Fla. 2009), *aff'd,* 362 F. App'x 100 (11th Cir. 2010). Plaintiffs argue that the Corps failed to do so.

CPRA wrote a letter to the Corps in 2019 explaining which alternatives it looked at. (AR 3189–3192). CPRA purported to have considered hundreds of potential project elements, studied 171 of these, and selected 13 for the 2018 permit application. (AR 3189). CPRA then provided its proposed alternative.

In the 2023, the Corps determined that a no-action alternative was not practicable because it would "prevent the applicant from restoring hydrology" and an off-site alternative was not practicable because of the "site-specific nature of this activity." (AR 7036–7037). The analysis, in large part, copied and pasted CPRA's 2019 alternatives letter. (AR 7037–7039). The Corps only provided one on-site alternative, which was the project proposed by the applicant. (AR 7038). The Corps explained that it ultimately selected CPRA's proposed project: "[t]he applicant designed the project to avoid onsite wetlands as much as possible. This design was selected because it minimizes wetland impacts to the maximum extent practicable while incorporating elements strategically located to maximize ecological benefit from improved flow and circulation. This alternative is a reduction of scope from the original design." (AR 7039).

The Court finds that the Corps' alternatives analysis is insufficient for two reasons. First, the EA fails to indicate in the EA that the Corps independently evaluated CPRA's 2019 alternatives study. The Corps is not required to "independently investigate" alternatives, but it must "independently evaluate the information submitted" by the applicant, 40 C.F.R. § 1506.5(b)(2), and the administrative record must demonstrate that the Corps "independently evaluate[d]

29

the information submitted" and "t[ook] responsibility for the scope and content of the" EAs and the underlying information's accuracy. *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-23-SDD-EWD, 2020 WL 1450750, at *11 (M.D. La. Mar. 25, 2020), citing 40 C.F.R. § 1506.5(a)–(b). This independent evaluation is important so that the public has access to and an understanding of the Corps' reasoning. *See Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997) ("The Corps and, more important, the public cannot know what the facts are until the Corps has tested" alternatives.). While CPRA's analysis within the EA notes that CPRA considered 171 individual elements, nowhere in the EA does the Corps personally discuss what any of these elements are, or discuss the environmental impacts of these alternatives, as required by 40 C.F.R. § 1501.5(c)(2). The Court does not have reason to doubt that the permit applicant conducted a thorough study of the 171 individual elements, but the Corps has failed to indicate in the EA that it reviewed the applicant's analysis of these elements or that it conducted its own independent analysis. Because of this, the public has no access to nor an understanding of the Corps' reasoning. Merely transferring the applicant's statement about its alternatives analysis, without more, does not constitute independent review.

Second, the Court finds that the Corps violated NEPA because it did not discuss the environmental impacts of any of the alternatives that could arise from the 171 studied elements. 40 C.F.R. § 1501.5(c)(2). The Corps is not required to evaluate every single possible combination of these elements, but the Corps has not discussed any of them as possible alternatives. The Corps also has not mentioned any

30

place in the record containing further discussion of these elements. The Corps only copied and pasted CPRA's email stating that CPRA considered various elements, and thus failed to show that it took a "hard look" at these as alternatives.

### D. The Corps Was Not Required to Supplement the 1982 EIS.

NEPA sometimes requires agencies to supplement an EIS. When "a major Federal action remains to occur" and the agency "makes substantial changes to the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearings on the proposed action or its impacts," the agency "shall prepare supplements to either draft or final environmental impact statements." 40 C.F.R. § 1502.9(d)(1)(i)–(ii).

Plaintiffs argue that the EGL Project is a major federal action yet to occur under the 1982 ABFS EIS, and two significant new circumstances require the Corps to supplement the EIS: (1) excess sedimentation at Buffalo Cove and Beau Bayou; and (2) increased levels of nitrogen and phosphorous leading to eutrophication and hypoxia. Plaintiffs assert that the EGL Project was "conditionally authorized" (as part of 'Flat Lake') in the 1982 ABFS EIS, and thus a proposed action in the EIS. (Doc 42 at 9).

The Corps replies that the 1982 EIS did not contemplate the EGL Project and did not approve detailed habitat restoration projects, such as the EGL Project. According to the Corps, the EGL Project is not mentioned in the 1982 EIS, nothing resembling the Project was proposed or analyzed in the EIS, and therefore it was not a proposed action in the 1982 EIS.

31

Plaintiffs disagree. They argue that the 1982 EIS contemplated the EGL Project. Plaintiffs cite the Chief of Engineers' report accompanying the 1982 EIS, which recommended "initial construction of two 'pilot' Management Units [Buffalo Cove and Henderson], with implementation of future units to be at the discretion of the Chief of Engineers after evaluation of the operational success of the pilot units." (AR 9528). Plaintiffs argue that the EGL Project is a proposed action in the 1982 EIS because it is a future unit at a WMU site.

The Court agrees with Defendants. Although the 1982 EIS created the Flat Lake WMU and envisioned a general project occurring there, reference to a future unit is far too amorphous and non-descript to constitute a "proposed action" under NEPA. Moreover, other courts have approved smaller EISs within larger EIS areas, rather than requiring an SEIS. *See Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,* 941 F.3d 1288 (11th Cir. 2019) (holding that the Corps satisfied NEPA by preparing a project-specific EIS within an area that already had an area-wide EIS).

### E. The Corps is Not Currently Required to Prepare an EIS for the Project.

Plaintiffs argue that if the Corps was not required to supplement the Basin-wide EIS, then the Corps was at least required to prepare an EIS for the smaller EGL Project. Under NEPA, agencies must determine whether a proposed action "[i]s likely to have significant effects and is therefore appropriate for an environmental impact statement." 40 C.F.R. § 1501.3(a)(3). When analyzing whether the effects of the project are significant, agencies "shall analyze the potentially affected environment and degree of the effects of the action." *Id.* § 1501.3(b). When considering the degree

32

of the effects, agencies must also consider: "(i) Both short- and long-term effects; (ii) Both beneficial and adverse effects; [and] (iii) Effects on public health and safety." *Id.* § 1501.3(b)(2)(i–iii). "In determining whether to prepare an EIS or issue a FONSI, an agency must take a 'hard look'" at environmental consequences. *O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at *1 (5th Cir. Oct. 12, 2023) (citing *Spiller v. White*, 352 F.3d 235, 242 (5th Cir. 2003)).

Plaintiffs argue that the record supports a finding of significant impact. Plaintiffs also argue that the Fifth Circuit precedent requires an agency to prepare an EIS when the administrative record contains evidence of possible significant impacts. *Citizen Advoc. for Responsible Expansion Inc. (I-Care) v. Dole*, 770 F.2d 423, 438–39 (5th Cir. 1985). In *Dole*, the Fifth Circuit emphasized that the "court should require the filing of an impact statement if the court finds that the project *may* cause a significant degradation of some human environmental factor." *Id.* at 438 (internal quotations omitted) (emphasis in original).

Plaintiffs argue that the Corps had evidence that the EGL Project was likely to cause significant effects in areas such as sedimentation, fisheries, water circulation, and flooding. (AR 5247–5301, 11940–11951). Plaintiffs add that because the Corps failed to rebut or even address evidence of significant impacts in the public comments and other portions of the record, the evidence before the Corps indicated that the EGL Project was likely to cause significant impacts. Thus, say Plaintiffs, a FONSI and an EIS were required.

The Corps, in response, reiterates that the FONSI was justified and

emphasizes that the Court should defer to the expertise and discretionary authority of the Corps.

The Court finds *O'Reilly v. All State Financial Company* instructive on this matter. *O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at \*4 (5th Cir. Oct. 12, 2023). There, the Corps' assessment of environmental impacts looked similar to the assessment here. In that case, the Corps' EA also included tables that summarized the Corps' analysis of the five categories of environmental characteristics and indicated the degree to which the project would affect those characteristics, which is basically identical to the tables here.[16] The United States Court of Appeals for the Fifth Circuit held that the issuance of a FONSI was unlawful because "the use of checkboxes without any comment or analysis is even less thorough and does not meet the level of scrutiny required by NEPA." *O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at \*5 (5th Cir. Oct. 12, 2023). The effects analysis is somewhat different here because the Corps does provide a four to six sentence analysis for each table. But the Fifth Circuit does note, referencing a previous case before it, that "[t]he deficient EA in the 2003 *O'Reilly* litigation was nearly twice the length of this one, and included a paragraph about the significance

---

[16] In that case, the EA includes tables that summarize the Corps' analysis of: (1) potential impacts on physical and chemical characteristics in the aquatic ecosystem; (2) potential impacts on biological characteristics in the aquatic ecosystem; (3) potential impacts on special aquatic sites; (4) potential impacts on human use characteristics; and (5) factual determinations of potential impacts. Each of those tables are drawn from the regulations associated with § 404 of the CWA. See 40 C.F.R. pt. 230. In those tables, the EA indicates whether TB II would have "no effect," a "negligible effect," a "minor effect (short term)," a "minor effect (long term)," or a "major effect" on the area. That matches the Corps' tables here.

of each physical impact. Even that was insufficient under NEPA." *Id.* at *5 (referring to *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 232 (5th Cir. 2007)). Furthermore, the Fifth Circuit has "repeatedly agreed that 'mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS." *O'Reilly*, 477 F.3d at 231 (quoting *Citizen Advocates for Responsible Expansion, Inc. (I-Care) v. Dole*, 770 F.2d 423, 434 (5th Cir. 1985)). That is because an EA must provide sufficient evidence and analysis in an impact analysis. 40 C.F.R. § 1501.5. But the Corps' impacts analysis does contain conclusory language that is insufficiently analytical. ("The benefits of this project outweigh project related wetland impacts. Impacts to wetlands are considered a minor long term effect." "Suspended particulates/turbidity, water, current patterns and water circulation, and normal water fluctuations will all be impacted by the project during and post construction and are considered a minor long-term effect." "[S]ubstrate converted from NWWs to wetlands in this case is considered a minor long-term effect in [the] creation of wetlands." AR 7040–7041.) The Fifth Circuit ultimately decided that "[b]ecause the [project's] EA lacks sufficient detail, we cannot say whether or not the project will have a significant effect on the environment—it remains 'an open question'" that necessitated a remand back to the Corps to reassess environmental significance. *O'Reilly,* 2023 WL 6635070, at 8. The Court at this time cannot definitively find that the evidence in the record will lead to a finding of significant impact. Therefore, the Court will vacate the Corps' issuance of a FONSI and provide the Corps the opportunity to address the deficiencies in its

analysis.

## F. The Corps Improperly Determined that the EGL Project Did Not Require Compensatory Mitigation.

The CWA requires an agency to compensate for any unavoidable loss of aquatic resource values with compensatory mitigation. 55 Fed. Reg. 9210, 9212 (March 12, 1990); *see also* 33 C.F.R. § 332.3(a)(1).

According to Plaintiffs, the Corps' determination that the Project's plan to spread dredged spoil would create or nourish the wetlands, and thus minimize adverse impacts, was unsupported in the record. The studies CPRA relied on only supported the conclusion that spreading spoil would not harm wetlands, not minimize adverse impacts, say Plaintiffs. (AR 5561). Plaintiffs also cited comments and studies that called into question the spoil-spreading method. (AR 12226; AR 12224). Plaintiffs argue that the Corps' FONSI did not provide an adequate assessment of the Project's potential impacts, and so the Corps could not possibly minimize impacts it was not aware of. Thus, Plaintiffs argue, the permit should have imposed compensatory mitigation requirements on CPRA.

The Corps responds that it minimized adverse impacts by reducing the project footprint, removing invasive species and planting native species, spreading dredged material in a thin layer, disposing of dredged material on previously disturbed areas, creating wetlands, and by adopting the AMP. Moreover, the Corps contends that it is not required to include mandatory remedial measures in its AMP. In sum, the Corps argues that compensatory mitigation was not required because the EGL Project

36

allegedly will create and enhance more wetlands than it harms. (AR 7049).

The Court has already found that the Corps' analysis of environmental factors was not sufficiently thorough, and that the Corps' conclusion that adverse impacts are minimized is unfounded. It is clear that the Corps has not determined that it has minimized adverse environmental impacts when it has not analyzed the environmental impacts to begin with. As noted, some environmental impact analyses are conclusory. Therefore, the Court must find that the Corps improperly determined that the EGL Project did not require compensatory mitigation.

### G. Attorney's Fees.

Because Plaintiffs provided no legal support for its request for attorney's fees and costs associated with this Motion, the Court will deny Plaintiffs' request for same at this time, without prejudice to Plaintiffs' right to seek attorney's fees after the entry of final judgment in this matter.

## V.    CONCLUSION

It is evident that all parties involved in this action understand the indispensable value that the Atchafalaya Basin provides to Louisiana, and indeed, our nation. However, the parties disagree about the appropriate methods for remedying the basin's deterioration.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 31) be and is hereby **DENIED IN PART AND GRANTED IN PART**.

**IT IS FURTHER ORDERED** that the Corps' issuance of Permit No. MVN-2016-01163-CM is **VACATED** because the Permit was illegally issued in

37

violation of NEPA, the CWA, and their implementing regulations.

**IT IS FURTHER ORDERED** that Permit No. MVN-2016-01163-CM is permanently **ENJOINED** until such time as the Corps addresses the deficiencies identified in its decision document.

**IT IS FURTHER ORDERED** that Permit No. MVN-2016-01163-CM's decision document containing the EA and CWA Section 404(b) analysis is **REMANDED** back to the Corps.

**IT IS FURTHER ORDERED** that Plaintiffs' request for attorney's fees is **DENIED WITHOUT PREJUDICE** to Plaintiffs' right to seek attorney's fees after the entry of final judgment in this matter.

**IT IS FURTHER ORDERED** that Defendants' Cross Motion for Summary Judgment (Doc. 40) be and is hereby **DENIED IN PART AND GRANTED IN PART**.

**IT IS FURTHER ORDERED** that the matter is **STAYED** and **ADMINISTRATIVELY CLOSED** to allow the Corps to rectify the deficiencies discussed herein.

Baton Rouge, Louisiana, this 31st day of March, 2026

_____
**JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

38